Hillsborough
No. 89-435

THE STATE OF NEW HAMPSHIRE

v.

LEON A. EVANS, JR.

July 3, 1991

*John P. Arnold,* attorney general (*David S. Peck,* assistant attorney general, on the brief), by brief for the State.

*W. Kirk Abbott, Jr.,* assistant appellate defender, of Concord, by brief for the defendant.

HORTON, J.  In this appeal from a conviction by jury for second degree assault against his infant child, *see* RSA 631:2, I (Supp. 1990),

the defendant argues that the Superior Court (*Pappagianis*, J.) erred in denying his motion to dismiss. The motion, made at the close of the evidence, was based on insufficiency of the evidence. The defendant asserted that the evidence was insufficient to prove reckless conduct or to prove the act which was medically identified as causing the serious bodily injury to the child. We affirm.

On October 17, 1987, Michelle LaPorte Evans was born to Rita LaPorte and the defendant. After being discharged from the Elliot Hospital, the baby lived with her mother, the defendant, Rita LaPorte's father and the couple's two-year-old daughter, Cassandra.

Dr. Sam Dugan, the attending pediatrician when Michelle was born, examined her on October 18, 1987, and found her to be in good neurological and physical health. Dr. Dugan conducted a routine follow-up examination on October 20, 1987, and found no problems with Michelle's health.

On October 23, 1987, Rita LaPorte stayed at home most of the day with Michelle. She left the house around 7:00 p.m. to pick up her father, and returned at approximately 10:00 p.m. The defendant stayed at home to watch Michelle and Cassandra. When Rita returned, the defendant informed her that Michelle had fallen from a couch. The defendant was angry with Rita for leaving him alone with the children, and claimed that it was her fault that Michelle had fallen from the couch. Rita immediately looked in on Michelle, who was asleep, and noticed that she had dried blood on both her nose and mouth. She also noticed that Michelle's lips were swollen and that there was a burn mark on Michelle's chest. Michelle's grandfather remembered that her nose appeared as though it had been pushed in.

The defendant explained to Rita that Michelle started to bleed because of her fall off the living room couch. He told her that the burn happened when he accidently brushed up against a lantern he was holding for light, while holding Michelle in his arms. The house's electricity had been shut off for non-payment of the electric bill. The defendant also told Rita that he had taken Michelle to the Elliot Hospital, but later admitted that this was a lie. Over the course of the next two days, Michelle's condition worsened. She became feverish and lethargic, and began to vomit after her feedings. Then, on October 26 and 27, her condition began to improve. Rita had diluted the baby formula, and Michelle was able to keep it down.

On October 28, Michelle's condition again deteriorated. On the morning of the 28th, Rita's father left for work. Rita and the defendant stayed at home with Michelle and Cassandra throughout most of

the day. Rita's father was at work. In the afternoon, Rita went for a job interview at a local market. During the hour she was gone, the defendant was alone with Michelle and Cassandra. The defendant told Rita he was angry because she refused to take Cassandra with her to the job interview. When Rita returned from the interview, she checked in on Michelle and noticed that her condition was worse; the lethargy and fever had returned, and her mouth had begun to bleed again. Rita questioned the defendant about Michelle's condition. The defendant said that he had tripped over his work boots while holding Michelle, and, that when he fell she had landed on his shoulder. Rita tried to feed the baby that afternoon, but Michelle's mouth was too swollen for her to eat.

Rita left again around 4:30 p.m. to get her father from work. She returned with her father, and went to work herself around 5:45 p.m. The defendant called Rita shortly after she had arrived at work and told her that Michelle had a temperature of 104 degrees, her eyes were rolling in her head, and her lips were swollen. Rita came home immediately, and she and the defendant took Michelle to the Hitchcock Clinic in Bedford.

Dr. Margaret Wiegand was the pediatrician on call that night. Dr. Wiegand testified that she noticed some blood crusted on Michelle's lips, a ruptured frenulum, which is the tissue connecting the gum to the upper lip, a two-inch long burn mark on Michelle's chest, and bruises on her right cheek and right calf. Of greatest concern to the doctor were Michelle's full or bulging fontanelle (the soft spot in a baby's cranium), her temperature of 102 degrees, and that she was limp and pale. The doctor, concerned because the bulging of the fontanelle indicated increased pressure inside the head, conducted a spinal tap and found that Michelle's spinal fluid was grossly bloodied. The doctor concluded from her tests and observations that Michelle's injuries resulted from either meningitis, or an intracranial hemorrhage. Because Dr. Wiegand did not have the facilities in her office to differentiate between the two, Michelle was transported to the pediatric ward of the Elliot Hospital.

The tests performed at the Elliot Hospital eventually ruled out meningitis as a possibility. At the hospital that night Michelle began having seizures, and during the following morning, she experienced periods of apnea, the cessation of breathing. All of Michelle's symptoms were consistent with neurological injury or disease. The serious nature of Michelle's problems caused Dr. Wiegand to have her transferred to Mary Hitchcock Hospital in Hanover.

Tests performed at Mary Hitchcock Hospital revealed that Michelle had permanently lost fifty percent of her brain tissue. The doctors determined that the injury to Michelle's brain was diffuse, and therefore not likely the result of a direct blow. Based upon the test results and their examinations, two of the doctors testified that Michelle's injuries were the result of a violent shaking. All of the doctors who examined Michelle testified that her injuries could not have been sustained from an accidental fall. One doctor testified that Michelle's injuries were very severe compared to most shaking injuries.

On October 29, after a referral from the Elliot Hospital, an investigator with the division of children and youth services (DCYS) began an investigation of possible child abuse. The investigator met with Rita and the defendant and told them that the preliminary diagnosis of Michelle's injuries was shaken baby syndrome. In response, Rita and the defendant began to offer possible explanations for Michelle's injuries. The defendant stated that Michelle's head injuries could have been caused when he tripped over a pair of sneakers and dropped Michelle. He also stated that the baby had fallen off a couch, which he estimated was one to two feet off the floor. Rita stated that the bruises possibly had come from burping the baby or holding her face when she was vomiting. As for the torn frenulum, the defendant stated that he fell another time and the baby landed on his chest. The investigator asked to interview the defendant and Rita separately. Rita agreed with this request, but the defendant refused.

On November 10, both the defendant and Rita again met with the investigator. At this meeting, the defendant suggested that the injuries might have been caused by "flipping" the baby. "Flipping" was described as holding the baby's head in one hand and legs in another, and then turning or rotating the child head over heels and back again. The defendant said that a doctor at Mary Hitchcock Hospital was going to sign a statement that this was how the injury to the brain had occurred. At this point, the defendant refused to provide the investigator with information concerning his future whereabouts.

After having spoken with the police in conjunction with the DCYS investigation, Rita told the defendant on November 14 that they "were through until [she] found out exactly what happened to Michelle." As a result of this conversation, the defendant contacted the police and agreed to be interviewed. In the interview, the defendant told Officers Glennon and Gilman that on October 23, Michelle had been burned when, while holding Michelle, he had leaned over to pick

up a lantern. Michelle began to scream and cry, angering the defendant. Twice the officers suggested to the defendant that Michelle's injuries were believed to be the result of an extreme shaking. At this point, the defendant put his head down on the table and began to cry. He confessed that he had shaken Michelle on October 23 because he was angry at her for crying and could not get her to stop. He said he took Michelle under both her arms and shook her for about 30 seconds. As a result of this admission, the officers arrested the defendant and brought him to the police station.

The officers had the defendant prepare a handwritten statement. In it, the defendant modified his story, stating that on the 23rd when he picked up Michelle, he was shaking from nervousness and that he shook her without knowing it. He also said that Cassandra had pulled Michelle off the couch. He claimed Michelle had been on the couch face up and that, when Cassandra pulled her blanket, Michelle fell off the couch and struck the back of her head on the floor.

While he was at the station the defendant asked to speak to another police officer. The defendant then told Officer Fowler that he had lied during the interview with Officers Glennon and Gilman, and that he wanted to alter his earlier confession. The defendant indicated to Officer Fowler that everything he had told Officers Glennon and Gilman was true except for his hurting or shaking Michelle. During his talk with Officer Fowler, the defendant also stated that he had told Rita the night before that he was going to go down to the police station and lie to the police, telling them that he was the one responsible for Michelle's injury. Officer Fowler confronted Rita with the lying plan statement on November 16, and Rita told Officer Fowler that there had been absolutely no discussion about the defendant's lying to the police.

In this appeal, the defendant makes two insufficiency arguments. First he asserts that the evidence was insufficient to prove that his shaking on October 23 had caused the injury which manifested itself on October 28; and, second, he claims that the evidence did not prove the requisite "reckless" measure of culpability. The familiar standard of review on such claims places the burden on the defendant to demonstrate that "no rational trier of fact, viewing the evidence most favorably to the State, could have found guilt beyond a reasonable doubt." *State v. Murray*, 129 N.H. 645, 650, 531 A.2d 323, 327 (1987). The jury may properly infer guilt from circumstantial evidence if that evidence excludes all other rational conclusions. *State v. Amell*, 131 N.H. 309, 311, 553 A.2d 286, 288 (1988); *State v. Bird*, 122

N.H. 10, 17, 440 A.2d 441, 445 (1982). Using these standards, we address the defendant's insufficiency claims.

The defendant argues that the evidence was insufficient to establish that the injury observed on October 28 was caused by the October 23 shaking, rather than by an accidental fall. Drs. Edwards, Nordgren and Sargent each testified that the shaking responsible for Michelle's neurological condition occurred within twenty-four to forty-eight hours before Michelle was admitted to the hospital on the 29th. Although testimony established that it was quite possible that the injury suffered on the 27th or 28th was compounded by the admitted shaking of October 23, Dr. Nordgren testified that if the injury had occurred prior to forty-eight hours before admission, the subdural hematoma would have been present at the time of admission, rather than not showing up until the fourth or fifth day after admission. However, to the extent that it is true that the October 23 shaking could not have caused Michelle's injuries, the evidence presented at trial supported the conclusion that the defendant shook Michelle again on October 28.

Rita left the defendant alone with Michelle and Cassandra on the 28th, once for a job interview and again to pick up her father from work. When Rita returned, Michelle was, as after the incident on the 23rd, bleeding from the mouth, pale, lethargic, feverish, and unable to keep food down. A few hours later, Michelle's fever had risen to 104 degrees and her eyes were rolling in her head. In explanation of Michelle's condition, the defendant maintained that he had accidently fallen and Michelle had hit her head on his shoulder. Contrary to this explanation, the doctors who examined Michelle all agreed that an accidental fall could not be the only explanation for her serious brain injury.

■■ Given the facts that the defendant had access to Michelle on October 28, and that he confessed to shaking her on the 23rd, and the medical opinions that Michelle was shaken twenty-four to forty-eight hours before her admission to the hospital, the evidence, taken in the light most favorable to the State, excludes all other rational conclusions. The jury was free, of course, "to determine the weight and credence to be given the evidence at trial," *State v. Meaney*, 129 N.H. 448, 451, 529 A.2d 384, 386 (1987), and "to reject any inferences urged by the defendant," *State v. Amell*, 131 N.H. at 311, 553 A.2d at 288. Thus, the jury could find, beyond a reasonable doubt, that the defendant caused Michelle's brain damage by shaking her on the 28th.

The defendant next argues that the culpability standard, "reckless", required to be proven for conviction of second degree assault, has not been proven beyond a reasonable doubt.

A person is guilty of second degree assault if he or she "recklessly causes serious bodily injury to another." RSA 631:2, I (Supp. 1990). "Recklessly" is defined in RSA 626:2, II(c).

> "A person acts recklessly with respect to a material element of an offense when *he is aware of* and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the circumstances *known to him*, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation."

(Emphasis added.) The defendant argues that there was insufficient evidence to find, beyond a reasonable doubt, that he acted recklessly. He correctly asserts that a defendant must be aware of the risk of serious bodily injury resulting from his actions, consciously disregard the risk, and have knowledge of circumstances that makes disregarding of the risk a "gross deviation" from law-abiding conduct, as defined. Thus, the test poses a subjective inquiry. The defendant contends that he was not aware of the risk inherent in his conduct and did not know of circumstances that would be necessary to find a gross deviation from law-abiding conduct. He argues that evidence that "flipping" was an accepted form of conduct in his own upbringing, of his concern over Michelle's condition, and of his reaction to the injury disclosures, all requires a finding of reasonable doubt on awareness and knowledge. He points out that the severe consequences of "shaken baby syndrome" are of relatively recent discovery and not circumstances widely known to society. The defendant emphasizes his testimony that he terminated the first shaking incident when he became aware of the risk, implying that he was unsure of the risk until the time when he stopped.

We disagree with the defendant's contention. He looks to the extreme severity of the injury to say that he could not be aware of such a result. The jury need not find that the defendant anticipated the precise result. *See, e.g., Michael v. State*, 767 P.2d 193, 201 (Alaska Ct. App. 1988) (injury is a result element of crime; the defendant "only needed to be reckless concerning the risk"). The jury need only find that the shaking of a newborn baby, in the manner discernible from the evidence, involved the substantial and unjusti-

fiable risk to that baby of *any* serious bodily injury. *Cf.* MODEL PE-NAL CODE § 2.03 comment 2, at 258 (1985) (the question is one of culpability, appropriate for submission to the jury). If the jury so determines, and further finds that the defendant was aware of that risk, yet consciously disregarded it, that circumstances existed permitting the characterization of this disregard as a gross deviation from law-abiding conduct, and that the defendant knew of these circumstances, then the "reckless" finding is proper.

The evidence at trial supports the verdict of the jury in all these essential respects. Having determined the fact of shaking, and the circumstances thereof, the jury can make the objective determinations that such shaking of a newborn baby involves the substantial and unjustifiable risk of some serious bodily injury and that the circumstances surrounding the shaking would make disregard of the risk a gross deviation from the conduct that a law-abiding person would observe in the situation.

█ One further objective step is available to the jury and is supported by the evidence. In support of its inquiry into the defendant's subjective awareness and knowledge, the jury may start with a threshold inference, objectively determined. "If the defendant's conduct is, in fact, risky, and if the risk is obvious, so that a reasonable man would realize it, we might well infer that he did in fact realize it; but the inference cannot be conclusive . . . ." W. LAFAVE & A. SCOTT, CRIMINAL LAW § 30, at 215 (1972). Although not essential to these determinations, Dr. Edwards, a physician who treated Michelle upon her admission to Mary Hitchcock Hospital, testified:

"Q. All right. Is there any way or did you undertake, I should say, or is there any way of determining the force that is required or was required to cause the injury that this child suffered?

A. There's no direct way of knowing that. We certainly have a lot of experience with accidental trauma where we know what the event was with relative certainty and know what the consequence of an event is. And the best I can, I can tell you is that to get to this type of injury requires extraordinary, out-of-the-realm of usual handling. It requires—and I guess the term would be violence is the best I can use to describe the amount of force that would be needed to cause this. I can't quantify the force but, but it would be in my opinion *an obvious deviation from, from usual handling of a child*."

(Emphasis added.)

Even armed with this threshold inference, the jury must determine that the defendant, himself, was aware of the risk and knew of the circumstances in order to make a finding of recklessness. The circumstances—the newborn status of the baby and the character of the shaking—were obvious and admitted by the defendant. No special or unique circumstances have been cited by the defendant to cause further inquiry into the jury's determination of circumstances. The defendant's argument goes to the issue of his subjective awareness of the risk.

■ There is seldom direct evidence of subjective awareness. Proof of subjective criminal elements may be proved "by any surrounding facts or circumstances from which such knowledge may be inferred." *State v. Brown*, 132 N.H. 321, 326, 565 A.2d 1035, 1038 (1989). The jury is permitted to consider a defendant's subsequent actions and explanations of an incident to judge the defendant's credibility. *See State v. Amell*, 131 N.H. at 311, 553 A.2d at 288. Specifically, the jury may infer culpability from attempts to cover up involvement or mislead the police. *State v. Murray*, 129 N.H. at 651, 531 A.2d at 327; *State v. Brown, supra* at 327, 565 A.2d at 1038.

The jury heard evidence concerning the defendant's conduct during his initial discussion of observed injuries, as well as in the stages of treatment of the infant and the extensive investigation by the authorities into the causes of the injuries. The defendant repeatedly cited incidents other than the shaking, at a time when he maintains that he still was unaware of the risk he created. His attempts to deny the shaking of the baby could lead the jury to find that his actions were anything but innocent. He avoided that element of potential cause, even though the shakings were close in time to the findings of injury. After finally admitting a shaking incident, he attempted to withdraw this admission. The defendant suggests that his admission, late in the game, and his subsequent conduct are not material to his state of mind at the time of the shaking incidents, since they followed disclosure of the ultimate harm and the medical analysis of cause. The effect of those disclosures is a matter for determination by the jury and, in any event, there was adequate evidence of conduct prior to the disclosures for the jury to find subjective awareness.

■ There is sufficient evidence in the record for the jury to find all elements of the crime charged and reach the verdict of guilty.

*Affirmed.*

All concurred.