STATE of Wisconsin, Plaintiff-Respondent,

v.

Jeffrey S. KIMBROUGH, Defendant-Appellant.†

Court of Appeals

*No. 00–2133–CR. Submitted on briefs March 21, 2001.—Decided May 30, 2001.*

## 2001 WI App 138

(Also reported in 630 N.W.2d 752.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Glenn L. Cushing*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David J. Becker*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. Jeffrey S. Kimbrough appeals from judgments of conviction for first-degree reckless homicide, contrary to WIS. STAT. § 940.02 (1997–98),[1] and child abuse, contrary to WIS. STAT.

---

[1] Because Kimbrough was arrested in 1998, we refer to that version of the applicable statute. All other references to the

§ 948.03(2)(a) and (5) (1997–98). Kimbrough also appeals from the order denying his motion for postconviction relief. On appeal, Kimbrough asserts that the State failed to establish beyond a reasonable doubt that he was subjectively aware that his conduct created an unreasonable and substantial risk of death or great bodily harm. Kimbrough also asserts that he was denied the effective assistance of counsel because his attorney failed to request that the offense of second-degree reckless homicide be submitted to the jury. We determine that the jury could reasonably infer Kimbrough's awareness of the risk from the nature of his conduct and statements he made after the victim was injured. We also hold that Kimbrough was not denied the effective assistance of counsel where the record shows that a reasonable attorney could have chosen an all-or-nothing approach as an objectively reasonable defense strategy.

¶ 2. Kimbrough's jury convictions stemmed from the death of five-and-one-half-month-old Anthony Beaton. The cause of death was shaken baby syndrome with impact. Kimbrough was dating Anthony's mother, April Beaton, at the time the following events unfolded.

¶ 3. On July 23, 1998, Kimbrough was babysitting Anthony and Beaton's other two children, Alexis and Deja, ages three years and fifteen months, respectively. Beaton testified that she returned home to find bruises on Anthony's face. Anthony kept crying, could not hold his head up, and would not eat normally. According to Beaton, Kimbrough suggested that maybe Deja had hit Anthony with a toy.

¶ 4. Beaton's concern increased the next morning and she took Anthony to Dr. Scott Meyer on Friday,

Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

July 24, 1998. Beaton told the doctor that Anthony acted like he had a concussion and that he had possibly been hit with a toy. Meyer examined Anthony carefully, because the possibility of abuse had occurred to him. He noticed mild bruising around the child's left eye, extending towards the temple and left ear. Anthony was irritable, but not in acute distress. There was no swelling, no other bruises and full eye movement. There was no bulging of the child's soft spot or fontanelle, which would have indicated cerebral edema or brain swelling. He diagnosed an ear infection and prescribed an antibiotic.

¶ 5. Beaton and Anthony returned home, where he continued to be irritable, crying and eating abnormally. Kimbrough babysat the children again on Friday while Beaton worked. She was told that Anthony seemed better and had been laughing and playing with Kimbrough.

¶ 6. By Saturday afternoon, July 25, 1998, Anthony's condition deteriorated while Beaton was out getting food. One of her roommates, Lindsey Brieske, discovered that Anthony was in distress, was having trouble breathing and had no heartbeat. She called 911, and Anthony was transported to the hospital where he remained in intensive care.

¶ 7. Although Anthony was subsequently released to his mother's care, he eventually died during the early morning hours of November 8, 1998. Both the medical examiner who conducted the autopsy and Dr. Stephen Lazoritz, a child abuse specialist, concluded that Anthony died from shaken baby syndrome with impact.

¶ 8. Detective Rick Ladd interviewed Kimbrough at the hospital where Anthony was in intensive care on July 30, 1998, and was present when Detective Michael

Payne took his statement on August 7, 1998. At the hospital, Kimbrough told Ladd that one of the other children told him Anthony had been hit with a toy. He offered no other explanation for what happened to Anthony.

¶ 9. When subsequently interviewed at the police station on August 7, the detectives expressed their belief that Kimbrough's explanation was not consistent with Anthony's injuries and their belief that Anthony was injured while in his care. Kimbrough denied shaking Anthony. Kimbrough then told the detectives that he had been weak from the flu and dropped Anthony to the floor. He was told that the injuries were more serious than that and was asked if he threw the baby. He then said that he had thrown Anthony into the couch. Again the detectives indicated that something more serious than that had happened to Anthony. Kimbrough then admitted to the detectives that he had wanted to lie down so he shook Anthony to keep him quiet. He admitted that the baby's head hit the wall. He also demonstrated for the detectives how he shook the baby, which both detectives re-enacted for the jury during testimony.

¶ 10. At trial, both the State and the defense called clinical psychologists who agreed that Kimbrough was of borderline intelligence with an IQ in the mid-seventies. Kimbrough's psychologist described him as having a limited knowledge of common words and underdeveloped social comprehension. His mental capacity was "roughly comparable to a mental age of an average 12 year old child." The State's psychologist was "more in agreement than disagreement" with the defense psychologist.

¶ 11. At the close of evidence, the jury received an instruction that in determining if Kimbrough knew

655

of and understood the danger of shaking a baby, it must consider his limited intellectual functioning and the fact that his intellectual age is that of a twelve-year-old child. On appeal, Kimbrough now argues the evidence was insufficient for the jury to find that he was subjectively aware of the unreasonable risk of death or great bodily harm caused by shaking a baby. He also makes a claim of ineffective assistance of counsel.

## Subjective Awareness of the Risk

¶ 12. The test for sufficiency of the evidence to convict is highly deferential. We may not reverse unless the evidence is so insufficient in probative value and force that as a matter of law, no reasonable fact finder could have determined guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). In applying this test, we view the evidence in the light most favorable to the conviction. *Id.* We also recognize that when the defendant's state of mind is at issue, direct proof of mental state is rare. *State v. Hoffman*, 106 Wis. 2d 185, 200, 316 N.W.2d 143 (Ct. App. 1982). In such cases, the jury may base its findings regarding the defendant's mental state upon circumstantial evidence and the reasonable inferences such evidence permits. *Johnson v. State*, 85 Wis. 2d 22, 32, 270 N.W.2d 153 (1978).

¶ 13. In order to obtain a conviction under Wis. Stat. § 940.02 (1997–98), the State must prove the four elements of first-degree reckless homicide:

1. The defendant caused someone's death;

2. By actions that created "an unreasonable and substantial risk of death or great bodily harm";

3. That the defendant was "aware of that risk"; and

4. The circumstances "show[ed] [the defendant's] utter disregard for human life."

*State v. Edmunds*, 229 Wis. 2d 67, 75, 598 N.W.2d 290 ( Ct. App. 1999) (citation omitted). The required mental state under this statute is criminal recklessness and encompasses the second and third elements of first-degree reckless homicide. *Id.* Criminal recklessness requires both an objectively unreasonable and substantial risk of death or great bodily harm and the actor's subjective awareness of the risk. *Id.* Thus, there are both objective and subjective components to the requisite mental state for first-degree reckless homicide.

¶ 14. Here, Kimbrough does not contest the sufficiency of evidence proving the objective component, that his conduct created an unreasonable and substantial risk of death or great bodily harm. Rather, he contests the subjective component, the sufficiency of evidence establishing that he was subjectively aware of that risk at the time of his conduct. He points to the following evidence as showing that in fact he was not aware of the risk: (1) he is of limited intelligence, (2) there is police testimony that he did not comprehend that his conduct posed a serious risk, and (3) there is expert opinion testimony that large numbers of people still do not realize the serious consequences which can result from shaking a baby.

¶ 15. With respect to Kimbrough's limited intellectual capacity, we note that while expert testimony established he had below average intelligence, it did

not establish that he is mentally retarded. In addition, while the State's psychologist testified that Kimbrough's general ability to anticipate consequences was underdeveloped compared to an average person, the testimony did not establish that Kimbrough was unable to appreciate the risk of shaking a baby. Although Lazoritz testified that large numbers of the population do not recognize the serious consequences that can result from such action, he also commented that with regard to "people who don't read a lot but watch TV, there are TV spots that say never shake a baby . . . ."

¶ 16. The most persuasive evidence that defense counsel presented on the issue of subjective awareness was the testimony of Payne and Ladd. Payne testified that during the investigation, he asked Kimbrough whether he knew why we do not shake children. Kimbrough's response was that he did not know then, but he does now. Ladd testified that in his opinion, Kimbrough did not realize the seriousness of shaking a baby:

> I do not believe that it was his intention to cause those injuries. I believe that his actions produced the injuries, and so I couldn't classify them totally or completely as accidental. It was just some unfortunate occurrence. I would say that he did not understand or did not realize how serious shaking a baby would be and I don't think he intended to injure the baby in the way the baby was injured, but it was a direct result of actions that he did take.

¶ 17. The State argues that the jury could nonetheless reasonably infer Kimbrough's subjective awareness of the risk from statements he made after the injury occurred. The record clearly establishes that

Kimbrough lied about his conduct to Anthony's mother and later to the police detectives as well. On the day he injured Anthony, Kimbrough's explanation for the benign bruising was that another child had hit Anthony with a toy. Later, as the signs of serious injury became apparent, Kimbrough told the detectives the same story. When they expressed disbelief, he claimed to have dropped Anthony to the floor. Again, when the detectives expressed doubt about this explanation, Kimbrough claimed to have thrown Anthony on a couch. Finally, he admitted to shaking Anthony and striking the baby's head against the wall.

¶ 18. While there may be other explanations for Kimbrough's reluctance to tell the victim's mother and the police that he shook the baby,[2] the jury could reasonably infer that the reason he lied was that he was aware of the risk his conduct posed. Indeed, the progressively escalating admissions of Kimbrough could lead to the reasonable inference that he was attempting to cover up his involvement in the crime. We concur with the view expressed in case law that such escalating admissions may be used by the jury to infer the defendant's subjective awareness of the risk posed by shaking a baby.

¶ 19. *State v. Evans*, 594 A.2d 154 (N.H. 1991), involved facts very similar to the instant case. In

---

[2] During the trial, defense counsel elicited testimony from Dr. Paul Voelkel, a psychologist, that persons with limited intellectual capacity are more open to suggestion during police interrogation and more easily intimidated, and therefore less likely to give reliable confessions. Kimbrough testified the reason he gave different explanations for the victim's injuries was that "I told [the detectives] the truth and they didn't believe me, so I didn't know what else to say."

*Evans,* the mother returned home to find her infant bruised, burned and bleeding. *Id.* at 155–56. The defendant caretaker explained that the victim had fallen off the couch. He told the mother that the burns were also accidental. *Id.* at 156. At first the baby improved, but as days passed she deteriorated and had to be hospitalized. *Id.* Hospital tests revealed that the injuries were due to violent shaking. *Id.* When questioned by police, the defendant suggested the injuries were due to falling from the couch, falling from his arms, or being "flipped." *Id.* at 157. After police expressed the belief that the injuries had resulted from extreme shaking, he confessed. *Id.*

¶ 20. As in this case, the defendant argued on appeal that the evidence was insufficient to show his subjective awareness of the risk posed by shaking an infant. The court rejected this view, holding that "[h]is attempts to deny the shaking of the baby could lead the jury to find that his actions were anything but innocent. He avoided that element of potential cause, even though the shakings were close in time to the findings of injury." *Id.* at 160.

¶ 21. Similarly, in *Terrell v. State,* 27 S.W.3d 423 (Ark. 2000), the court found that the defendant's conduct in giving different versions of his actions to medical and other authorities belied his assertion that he did not know the risk of shaking a baby. *Id.* at 426. "In fact, appellant's failure to disclose the shaking incidents to authorities basically amounts to an attempt to cover up his connection to the crime. This attempt was before the jury, and the jury could have properly considered evidence of cover-up as proof of a purposeful mental state." *Id.*

¶ 22. Kimbrough asserts that the evidence establishes only his awareness immediately after the

conduct, that he had behaved improperly with the child, or later, that his conduct had caused serious injury and death. He contends it is insufficient to establish the requisite awareness of the risk at the time of injury. Kimbrough offers no authority to support this position. Moreover, the *Evans* court addressed a similar argument and we agree with its response that whether the evidence establishes awareness at the time of the shaking incident, rather than afterward, is a matter for determination by the jury. *Evans*, 594 A.2d at 160.

¶ 23. While the record contains evidence that both supports and contradicts the proof of Kimbrough's mental state, it was well within the function of the jury to determine which evidence was most credible and to make the appropriate inferences. We are convinced that a reasonable jury could conclude that Kimbrough was aware of the risk of serious bodily injury or death resulting from shaking a baby.[3]

### Ineffective Assistance of Counsel

¶ 24. We now address Kimbrough's second basis for appeal, that he received ineffective assistance of counsel because his trial counsel did not request a lesser-included offense instruction of second-degree

---

[3] In its brief, the State urges this court to follow the approach of *People v. Kendall*, 678 N.Y.S.2d 182 (N.Y. App. Div. 1998), in which it was held that the circumstances surrounding the death of a shaken infant can be sufficient, standing alone, to prove the defendant's state of mind. Because a jury could infer Kimbrough's awareness of the risk from statements he made to police, we need not address whether the risk of danger to a baby from vigorous shaking is so obvious that the jury could infer Kimbrough's awareness on that basis alone.

reckless homicide.[4] At the postconviction motion hearing, trial counsel testified that he had intended to request that the jury be given the option of convicting Kimbrough of the lesser-included offense, but he inadvertently failed to do so. He explicitly stated he was not pursuing an all-or-nothing defense strategy and that he believed the better strategy was to give more options to the jury. The trial court made a finding of fact that defense counsel never intended to request the lesser-included offense instruction. It concluded that the performance of defense counsel at trial was not deficient as a matter of law.

¶ 25. On this appeal, Kimbrough points out that the testimony of trial counsel at the postconviction hearing was uncontroverted. Because the record does not indicate that this testimony was incredible, Kimbrough asserts that the trial court's findings contrary to this testimony must be clearly erroneous as a matter of law.

¶ 26. To establish an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that he or she was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A reviewing court may dispose of a claim of ineffective assistance of counsel on either ground. *Id.* at 697. Consequently, if counsel's performance was not deficient the claim fails and this court's inquiry is done.

---

[4] The elements of second-degree reckless homicide include all of the elements of first-degree reckless homicide except for proof that the crime occurred under circumstances which show utter disregard for human life. *Compare* Wis. Stat. § 940.02 (1997–98) *with* Wis. Stat. § 940.06 (1997–98).

¶ 27. We review the denial of an ineffective assistance claim as a mixed question of fact and law. *Id.* at 698. We will not reverse the trial court's factual findings unless they are clearly erroneous. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). However, we review the two-pronged determination of trial counsel's effectiveness independently as a question of law. *Id.* at 128.

¶ 28. As we noted, Kimbrough asserts that the trial court was clearly erroneous in rejecting defense counsel's averment at the motion hearing. We understand Kimbrough to argue that a statement must be contradicted in the record as a condition precedent to the trial court's review of the statement's credibility. In other words, Kimbrough argues that the trier of fact must find true, as a matter of law, the testimony of a witness that is unimpeached and not inherently unreliable. If this is indeed his argument, the law is to the contrary.

¶ 29. A trial court has the responsibility, when acting as a trier of fact, to determine the credibility of each witness. *Gauthier v. State*, 28 Wis. 2d 412, 416, 137 N.W.2d 101 (1965). A trial court can properly reject even uncontroverted testimony if it finds the facts underpinning the testimony are untrue. *See, e.g., Breunig v. Am. Family Ins. Co.*, 45 Wis. 2d 536, 544–45, 173 N.W.2d 619 (1970) (upholding verdict based upon jury's rejection of uncontroverted expert opinion testimony regarding negligent actor's mental disability). Even when a single witness testifies, a trial court may choose to believe some assertions of the witness and disbelieve others. *Nabbefeld v. State*, 83 Wis. 2d 515, 529, 266 N.W.2d 292 (1978). This is especially true

when the witness is the sole possessor of the relevant facts. *See Ring v. State*, 192 Wis. 391, 394, 212 N.W. 662 (1927). "If it were the law that the testimony of a witness in a given case, on a subject which is solely within his knowledge, must be taken as true one hundred per cent., justice in many instances would miscarry. It is the province of the [trier of fact] to carefully scan and review the entire evidence in connection with all the facts and circumstances of the case, and thereupon render [a] verdict . . . ." *Id.* at 395. We conclude, therefore, that the trial court in this case was free to accept or reject all or any portion of defense counsel's testimony as it deemed credible.

■

¶ 30. In this instance, the trial court, acting as trier of fact, did not find credible defense counsel's explanation for his conduct. The trial court clearly and meticulously described those parts of the record that supported its factual finding that the failure to request the lesser-included offense was deliberate rather than inadvertent. The court pointed out that the possibility of including second-degree reckless homicide was never mentioned during opening statements. In addition, defense counsel thoughtfully and carefully prepared two special jury instructions over a long weekend that did not include the lesser-included offense. The court concluded:

> The assertion today is that second degree reckless homicide was a part of the theory of defense but it by inadvertence, by forgetting, it just wasn't included. And yet when we look to all the opportunities before trial, during the trial, during the three-day break in the trial, during the . . . instruction and verdict conference, during the arguments that were made, and then after the instructions were actually

> given when there was also an opportunity to [sic] was there anything else, are they acceptable; still, the matter was not . . . presented as an issue that was a part of the theory of the defense to include second degree reckless homicide.

We hold that the finding of the trial court is supported by the record and not clearly erroneous as a matter of law.

¶ 31. Moreover, our function upon appeal is to determine whether defense counsel's performance was objectively reasonable according to prevailing professional norms. *Strickland*, 466 U.S. at 688. We have no doubt whatsoever that in this instance counsel's conduct was objectively reasonable. *See United States v. Smith*, 10 F.3d 724, 728 (10th Cir. 1993). In *Smith*, the Tenth Circuit Court of Appeals held that defense counsel's failure to request a lesser-included offense instruction was reasonable despite counsel's subjective averment that he overlooked the availability of such a defense. *Id.* at 728–29. The court found that, considering all the circumstances, such a decision would have been reasonable if defense counsel had made it for strategic reasons. *Id.* at 729.

¶ 32. Applying the reasoning of *Smith* to this case, if defense counsel here had chosen for strategic purposes to avoid the lesser-included defense instruction, the decision would have been imminently reasonable under the circumstances. The record demonstrates Kimbrough had two theories of defense: that he did not shake the baby and, if he did, he was not subjectively aware of the risk his conduct created. Kimbrough testified in his own defense and also put on witnesses to support his contention that he was not aware of the dangerousness of his conduct to the well-being of the baby. This evidence, which we discussed in

665

the previous portion of this opinion, was not weak and a reasonable attorney might decide that an all-or-nothing strategy was viable. It would not be unreasonable, in other words, to go for acquittal rather than risk conviction of second-degree reckless homicide. This approach would also avoid confusing the jury with another alternative defense and focus the jury's attention upon factors sympathetic to Kimbrough, such as his low intelligence and inexperience with children. We are satisfied that defense counsel's actual representation was well within the range of objectively reasonable representation under all the circumstances.

¶ 33. Kimbrough argues that this is an "invent-a-strategy" approach to review of ineffective counsel claims that undermines the procedure outlined in *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).[5] Kimbrough asks us to adopt the reasoning in *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990), in which the Seventh Circuit Court of Appeals stated that "[j]ust as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Id*. at 878. This statement, however, was made in the context of a felony murder case with very different facts.

¶ 34. In *Harris*, defense counsel refused to offer a theory of defense after the prosecution rested its case. *Id*. at 874. Not a single witness was called to the stand, even though the record indicated witnesses were avail-

---

[5] During a *Machner* hearing, trial counsel testifies about the reasons for the conduct that is attacked as deficient performance and, from that testimony, the reviewing court determines whether trial counsel's actions were the result of incompetence or deliberate trial strategy. *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

able who would identify another person as the assailant. Instead, counsel decided to tempt the fates by resting on the perceived weakness of the prosecution's case. *Id.* at 878–79. The court found that the district court had denied the ineffective assistance claim based upon a trial strategy that trial counsel had not offered. *Id.* Looking objectively at counsel's overall performance at trial, the court concluded that his conduct fell outside the wide range of professionally competent assistance. *Id.* at 877–79.

¶ 35. Clearly, the reasoning in *Harris* does not require a reviewing court to view defense counsel's subjective testimony as dispositive of an ineffective assistance claim. Such testimony is simply evidence to be considered along with other evidence in the record that a court will examine in assessing counsel's overall performance. Consequently, we hold that defense counsel's representation of Kimbrough was objectively reasonable under all the circumstances and ensured that Kimbrough received a fair trial. Therefore, Kimbrough has failed to demonstrate that his representation was constitutionally deficient.

¶ 36. In conclusion, we hold that the evidence was sufficient for the jury to have drawn the appropriate inference that Kimbrough acted with criminal recklessness in causing the death of Anthony. We also hold that defense counsel's representation of Kimbrough was well within the range of professionally competent assistance. Therefore, we affirm.

*By the Court.*—Judgments and order affirmed.