BRENNAN, J.
¶1 Sadiq Imani appeals from a judgment of conviction, entered on a jury verdict, for armed robbery by use of force and false imprisonment, both as party to a crime. The convictions related to Imani's robbery of the North 76th Street TCF Bank in Milwaukee on August 2, 2013. Imani also appeals the denial of his motion for postconviction relief.[1] He seeks a Machner hearing[2] on his claim of ineffective assistance of counsel. He argues that trial counsel was constitutionally ineffective for two reasons: (1) he did not object to the use of a 1999 felony conviction to impeach Imani when he testified, and (2) he advised Imani to testify and did not tell him that prior to trial the State had provided counsel interview notes from a witness who would directly contradict Imani's alibi.
¶2 At trial, the State linked Imani to the crime in two ways. The State showed that friends Imani had known for years were found at a casino using dye-stained bills taken in the robbery, and they told police the money came from Imani. The State also showed that Imani's DNA matched the only DNA found on the mask found at the scene of the robbery. In addition, evidence showed that on the morning of the robbery, Imani's niece, with whom he lived, was an employee at the TCF Bank that was robbed, arrived at the bank on a day she was not scheduled to work, and came in the back door of the bank with Imani.
¶3 Imani's Strickland claim fails on the prejudice prong: regardless of whether the alleged errors constituted deficient performance, there is not a reasonable probability that but for the alleged errors, the result of the proceedings would have been different. See Strickland v. Washington , 466 U.S. 668, 687 (1984). Because the totality of the record shows that Imani is not entitled to relief, the postconviction court correctly denied his postconviction motion without a hearing. See State v. Balliette , 2011 WI 79, ¶¶50, 56-59, 336 Wis. 2d 358, 805 N.W.2d 334.
BACKGROUND
The robbery and investigation.
¶4 Early on the morning of August 2, 2013, a man who was carrying a handgun and wearing a mask followed J.G., a bank employee, into the back door of the TCF Bank. One other employee, K.K., was working at the time. The robber had J.G. handcuff K.K., and he demanded money from the safe. The employees complied. The robbery was captured on the bank's surveillance video.
¶5 The man left the bank with approximately $108,000, and as he was attempting to flee in a car belonging to one of the employees, the dye pack exploded. When police arrived at the scene, they found several items in the parking lot where the robber had fled: a black plastic mask, the remnants of the exploded dye pack, and two fifty dollar bills stained with pink dye.
¶6 Four days after the bank robbery, security personnel at a casino observed two people using dye-stained money to play slot machines. When police interviewed them, the two said that they were friends of Imani and that he had given them the money to settle a debt.
¶7 DNA testing of the inside of the black plastic mask showed the presence of male DNA from one person. With a search warrant, police obtained DNA samples from Imani. The DNA from the mask matched Imani. Imani was charged in connection with the robbery, and the case proceeded to a jury trial.
The State's case.
¶8 At trial, the State presented testimony from K.K., who testified about the details of the robbery; bank employees who testified about the bank's practices; a DNA analyst who testified that the mask contained a large quantity of DNA from only one male and that the DNA was matched to Imani; and detectives who testified about the evidence that was recovered from the scene and the evidence that led them to identify Imani. The jury saw photos of the scene, heard audio of police questioning Imani, and watched interior and exterior surveillance videos of the robbery.
¶9 K.K. also testified that her co-worker J.G., who had been a part-time teller for a few months, came in to work that morning even though she was not scheduled to work. K.K. testified that J.G. told her she needed to go outside to retrieve her cell phone, and when she returned, the robber came in the back door behind her. During the robbery, the robber had J.G. handcuff K.K. behind her back, and the robber then directed them at gunpoint to open the vault. When the robber told K.K. to give J.G. the code, she did so, but J.G. was unsuccessful in entering it, so K.K., still handcuffed, entered the code and opened the vault. Later, on cross-examination, the State elicited from Imani that he lived with J.G., his niece, and that he knew that she worked "at a bank over there in that area" of North 76th Street.
The defense's case.
¶10 Prior to trial, Imani filed a notice of alibi stating that Barbara Lewis would testify that on the day of the robbery he was at her home in Horn Lake, Mississippi. At trial, after the State rested, trial counsel told the trial court that Imani would be the only defense witness to testify and that he would be testifying "consistent with the statement that he gave to the police" when he was first interviewed by police in January 2014-that he was in Mississippi with Lewis at the time of the crime. The following morning, with Imani present, the trial court asked the prosecutor and defense counsel about the issue of alibi testimony. The State told the trial court that it did not object to Imani's alibi testimony about being driven to Mississippi by a friend prior to the robbery because the friend, whose interview with police had been provided in discovery prior to trial, would be called to testify:
I had provided counsel early on-and it was with the original discovery with notes related to a witness, Heather Deckow, that the State would call in response to an alibi if Mr. Imani testifies.
And she is prepared to do that, so the State is not prejudiced at all at this point if the defendant plans on taking the stand.
The trial court proceeded with the colloquy with Imani, ascertaining that he understood and was waiving his constitutional right to remain silent. After the colloquy, the trial court asked Imani what decision he had made, and Imani replied, "I will be testifying."
¶11 The trial court then turned to the question of the number of convictions that would be used, pursuant to WIS. STAT. § 906.09 (2015-16),[3] for impeachment purposes. The State's position was that the number of convictions was three, consisting of a 1995 adjudication of delinquency for burglary, a 1999 felony conviction for felon in possession of a firearm, and a 2000 misdemeanor marijuana possession conviction. Defense counsel argued that the court should limit the number of convictions to Imani's adult record and omit the 1995 adjudication and also omit the misdemeanor marijuana conviction. Regarding the 1999 conviction, trial counsel stated, "[I]t is an adult conviction. It is a felony. And I don't make any claim that I think that that should be properly excluded by the Court's discretion." The trial court determined that for purposes of § 906.09 impeachment, the number of convictions would be three. The trial court noted that the felon in possession charge was based on the delinquency adjudication for burglary, "so they're sort of tied together[.]" The trial court noted that under state law, the determination of which convictions to use for § 906.09 purposes was within the trial court's discretion.
¶12 Imani testified that he left Milwaukee on July 28, 2013, and on August 2, 2013, he was in Horn Lake, Mississippi. He testified that when he is in Milwaukee, he stays with his nieces, J.G. and S.G. He testified that he paid a woman named Heather, a longtime friend, $150 to take him down south.
¶13 The State called two witnesses in rebuttal. The first was a detective who had questioned Imani, and during his testimony the State introduced video of Imani's questioning by police that contradicted Imani's testimony in various ways. The second was Heather Deckow, who testified that she had known Imani since she was "a young kid." She testified that she had come to Milwaukee from her home in Horn Lake, Mississippi at the end of July and returned to Mississippi with her children, her fiancé, and his son in the first week of August. When she was asked if she had ever driven Imani down to Mississippi at the beginning of August or the end of July 2013, she answered, "I did not."
¶14 The defense, in closing arguments, focused on K.K.'s inability to positively identify anyone as the robber, other explanations for how Imani's DNA ended up on the mask, and other scenarios that would explain the evidence linking him to the crime. Essentially, defense in closing asked the jury to believe Imani rather than Deckow and suggested that J.G. had framed Imani by putting his DNA on the mask and carrying out the robbery as an inside job with another, unidentified person.
¶15 The jury convicted Imani on both counts.
The postconviction motion.
¶16 Imani's motion for postconviction relief argued that he was entitled to a new trial on the grounds of ineffective assistance of counsel. The trial court denied the motion without a hearing. It held that Imani's first claim concerning the inclusion of the felony conviction for impeachment purposes failed the Strickland prejudice prong, concluding that "there is no reasonable probability that the court would have excluded the most serious conviction in the defendant's record had counsel objected to its use." It further held that Imani's claim that counsel improperly advised him to testify failed on the same grounds, concluding that due to the "compelling and uniquely incriminating evidence of guilt" there was not a reasonable likelihood of a different outcome if he had chosen not to testify:
The State's DNA analyst testified that a significant amount of the defendant's DNA, and only the defendant's DNA, was recovered from the areas of the nose and mouth of the mask, where she would expect to find the DNA of the person that had worn the mask for more than a few minutes, such as during the course of the robbery. Too, money stolen during the robbery was traced right back to the defendant. Without a credible explanation to counter the State's evidence, there is no reasonable probability that the outcome of the trial would have been different if the defendant would have chosen to remain silent.
DISCUSSION
Standard of review and governing law.
¶17 To prevail on a claim of ineffective assistance of trial counsel, a defendant must establish both that trial counsel's performance was deficient and that this performance prejudiced his defense. See Strickland , 466 U.S. at 687. "The defendant must overcome a strong presumption that his or her counsel acted reasonably within professional norms." State v. Swinson , 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. For representation to be deficient, it must consist of "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." State v. Allen , 2004 WI 106, ¶26, 274 Wis. 2d 568, 682 N.W.2d 433 (citation omitted). To prove prejudice, a defendant must show that there is a reasonable probability that but for the deficiency, the result of the proceedings would have been different. Id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation omitted). Where the defendant cannot show prejudice, that ends the inquiry. When "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Strickland , 466 U.S. at 697.
¶18 We review an ineffective assistance claim as a mixed question of law and fact. See State v. Kimbrough , 2001 WI App 138, ¶27, 246 Wis. 2d 648, 630 N.W.2d 752. "We will not reverse the trial court's factual findings unless they are clearly erroneous[,]" but we review the effectiveness and prejudice questions independently of the trial court. See id.
¶19 The sufficiency of a postconviction motion seeking an evidentiary hearing is a question of law that we review de novo . See Balliette , 336 Wis. 2d 358, ¶18. If the motion fails to allege sufficient facts or presents only conclusory allegations it is insufficient to require a hearing. Id. Even if the motion is sufficient on its face, but the totality of the record shows that the defendant is not entitled to relief, it is insufficient to warrant an evidentiary hearing. Id. , ¶¶50, 56-59.
There is not a reasonable likelihood that Imani would not have been convicted but for counsel's failure to object to the use of Imani's 1999 felony conviction for impeaching his testimony.
¶20 WISCONSIN STAT. § 906.09 permits asking a witness how many times the witness has been convicted or adjudicated delinquent "[f]or the purpose of attacking character for truthfulness[.]" Sec. 906.09(1). A court considers any relevant factors in deciding whether a particular conviction or adjudication should be excluded because "its probative value is substantially outweighed by the danger of unfair prejudice." Sec. 906.09(2). Our supreme court has interpreted the statute as "inten[ding] that all criminal convictions be generally admissible for impeachment purposes." State v. Kuntz , 160 Wis. 2d 722, 751-52, 467 N.W.2d 531 (1991).
¶21 As noted above, prior to Imani's testimony, the parties argued about how many convictions would be used for WIS. STAT. § 906.09 impeachment purposes. Imani's trial counsel argued that two of the three convictions and adjudications were stale and that their probative value was outweighed by the danger of unfair prejudice. He did not seek to have the 1999 felony excluded. The trial court concluded that the number of convictions and adjudications was three. When Imani testified, he was asked on direct examination, "Have you ever been convicted of a crime, Mr. Imani?" and he answered, "Yes, I have." He was asked, "How many times?" And he answered, "I say three."
¶22 Imani argues that trial counsel's failure to attempt to exclude the 1999 felony was deficient performance because the felony was fifteen years old; because aside from a thirty-day sentence for the misdemeanor conviction, Imani had been out of custody for the entire time; and because the felony conviction had resulted in only a six-month sentence. He further argues that failing to seek to exclude it was prejudicial because convictions are relevant to a witness's credibility, and the higher the number, the greater the effect on credibility. He argues that his credibility was key to the case because the only evidence connecting him to the robbery was the circumstantial evidence of his DNA on the mask, and that may have been there for an innocent reason, such as Imani "[trying] the mask outside of the bank at some time prior to the armed robbery."
¶23 The question is whether there is a reasonable probability that Imani would not have been convicted but for counsel's failure to attempt to exclude the felony. A reasonable probability is a probability "sufficient to undermine confidence in the outcome" of the proceeding. Strickland , 466 U.S. at 694.
¶24 There is not a reasonable probability that Imani would not have been convicted but for this omission by counsel. The evidence against Imani was strong and convincing: in physical build he resembled the robber seen on the surveillance video, he was connected to the robbery by (1) the fact that a family member with whom he lived was employed at the bank and without explanation arrived to work on the morning of the robbery when she was not scheduled to work; (2) the fact that money from the robbery was traced back to him; and (3) the substantial amount of his DNA and only his DNA that was found on a mask found in the bank's parking lot. The fact that he was required to answer "three" rather than "two" when asked about prior convictions during his testimony does not undermine this court's confidence in the outcome of the proceeding. Imani has not shown that he was prejudiced by the allegedly deficient performance, and therefore this claim fails.
There is not a reasonable likelihood that Imani would not have been convicted but for his decision to testify.
¶25 Improper advice to a client can constitute ineffective assistance of counsel. See State v. Lentowski , 212 Wis. 2d 849, 854-55, 569 N.W.2d 758 (Ct. App. 1997). In an affidavit attached to his postconviction motion, Imani averred that he had not wanted to testify but was urged to testify by his trial counsel. He avers that trial counsel did not share the discovery that the State had turned over showing that Imani's friend had told police, contrary to Imani's account, that she did not drive him to Mississippi the week before the robbery. He avers that trial counsel's advice to testify led him to testify, which in turn allowed the State to call a witness to contradict his testimony. He argues that but for this error by trial counsel, there is a reasonable probability that he would not have been convicted.
¶26 We address only whether this claimed deficiency, even if true, prejudiced Imani. As noted above, the evidence presented by the State strongly implicated Imani. Like the postconviction court, we conclude that "[w]ithout a credible explanation to counter the State's evidence, there is no reasonable probability that the outcome of the trial would have been different if the defendant would have chosen to remain silent."
¶27 We therefore affirm.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

The Honorable William S. Pocan presided over the trial and entered the judgment and the Honorable David A. Hansher issued the order denying Imani's postconviction motion.

State v. Machner , 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (holding that without a hearing to preserve the testimony of trial counsel as to the claimed ineffective assistance, a court cannot grant a new trial).

All references to the Wisconsin statutes are to the 2015-16 version unless otherwise noted.