COURT OF APPEALS
DECISION
DATED AND FILED

November 6, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2024AP1167-CR**

Cir. Ct. No. 2019CF2563

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

CALLUM B.T. GREY,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County: JULIE GENOVESE, Judge. *Affirmed*.

Before Graham, P.J., Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Callum Grey appeals a judgment of conviction and order of the circuit court denying his motion for postconviction relief.  After a two-day jury trial, Grey was convicted of second-degree sexual assault of an intoxicated victim in violation of WIS. STAT. § 940.225(2)(cm).[1]  He asserts that he is entitled to a new trial because his trial counsel provided ineffective assistance by failing to present certain evidence to support his theory of defense, which was that his sexual encounter with the victim was consensual and not a sexual assault.  We conclude that Grey has not shown that his trial counsel was constitutionally ineffective.  Therefore, we affirm.

## BACKGROUND

### I.  Trial

¶2      The first witness at Grey's trial was the police officer who first investigated the alleged assault, and who testified as follows.  On the evening of July 12, 2019, the officer reported to the house where Grey and his girlfriend resided after the girlfriend reported that there was a car she did not recognize in the driveway and she wanted it moved.  The officer determined that the car was registered to A.B.,[2] who lived at a nearby address.  The officer went to that address and made contact with A.B.'s boyfriend, who accompanied the officer to Grey's house.  At that point, the officer believed he had "assisted in discovering an infidelity situation" and left.  About an hour later, A.B.'s boyfriend called the officer to report that he

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

[2]  Pursuant to the policy underlying WIS. STAT. RULE 809.86(4), we refer to the victim using initials that do not correspond with her name.  We also omit the names of the other witnesses.

found A.B. and Grey in a bedroom at the house and A.B. "appeared to be … drugged or under the influence of something."

¶3 A.B.'s boyfriend, who was the next witness, testified as follows. On the morning of the assault, A.B. texted to say that she would be going to Grey's house after work to discuss the establishment of a dog park in their community. After A.B.'s boyfriend arrived at the house that evening, Grey's girlfriend pointed to a closed bedroom door and said, "[T]hey're in there." The boyfriend tried to open the locked door with a wrench, and Grey opened the door. The boyfriend saw A.B. lying on the bed, clothed, and Grey told him they had had "a large quantity of scotch whiskey." A.B. appeared to be disoriented; her boyfriend had to help her get out of the bed, and he heard her vomiting in the bathroom. The boyfriend helped A.B. to the passenger seat of her car, and just before he pulled out of the driveway, Grey's girlfriend came out of the house and threw A.B.'s underwear at the car. A.B. vomited or retched several times on the way home, and she needed help getting into her house. A.B.'s boyfriend called law enforcement because A.B.'s "condition just wasn't normal," she was "very disoriented and could hardly speak," but it "didn't seem like she was drunk."

¶4 A.B. testified as follows. She "connected [with Grey] through Facebook messenger" and he informed her about a dog park being established in the community. A.B. knew Grey casually; she had worked with his mother and with his girlfriend at different jobs in the past. Grey told A.B. that he "verified" her as a member of the "private [Facebook] page" for the dog park, but A.B. later found out that "was not true."

¶5 A.B. further testified that she went to Grey's house on July 12 to talk about the dog park. After she arrived at around 1:05 p.m., Grey gave her a whiskey

3

drink that she did not see him prepare. A.B. took two or three sips of this drink before remarking that it "tasted funny," and then Grey made her a Turkish coffee. A.B. testified that she felt "light and giddy" and not like herself after she drank the coffee. She remembered Grey handing her a bottle, from which she "took a swig" despite noticing that her whiskey glass was still full.

¶6 A.B. testified that Grey began unhooking her bra. She asked him if this was "a booty call" and said, "I'm not into it." At this point, A.B. felt dizzy and was unable to see or hear clearly. Grey removed her shirt, and she said, "I don't want to do this." Grey put his mouth on her breast and then walked behind her down the hall. The next thing A.B. remembered was waking up naked in the bedroom with Grey "on top of [her] with his phone up like he was taking a picture or video." A.B. did not know how much time had passed, but it was dark outside. Grey was not wearing any pants. A.B. heard Grey's girlfriend's voice, and Grey responded by saying that he was resting. A.B. then heard a knock on the door. Things were "foggy," but she remembered that she "suddenly had clothes on" when the door opened and her boyfriend entered the bedroom. She felt sick and rushed to the bathroom to vomit.

¶7 A.B. further testified that after her boyfriend helped her into her car, Grey approached the car and said, "[E]verything's okay. We don't need to call the cops. You had a good time." Other than throwing up one time on the way, A.B. did not remember the drive home.

¶8 On cross-examination, Grey's trial counsel asked A.B. about her testimony that Grey lied about the dog park Facebook group. A.B. denied that Grey had been one of the administrators of the page, and she testified that Grey "did not approve" her acceptance into the Facebook group.

¶9 Grey's girlfriend was the sole witness for the defense and testified as follows. When she got home from work at around 7:30 p.m., she parked on the street because an unfamiliar car was in the driveway. The door to the guest bedroom was locked, and she heard "noises inside" that "sounded like … a woman's voice and she was enjoying herself." When the girlfriend knocked on the door and asked Grey what was going on, he responded that he was sleeping. She could not hear the specifics of what was being said in the bedroom. She called the police about the car in the driveway, and she tried unsuccessfully to unlock the bedroom door.

¶10 Grey's girlfriend further testified that after the officer returned to her house with A.B.'s boyfriend, the boyfriend knocked on the locked bedroom door and identified himself. As he was attempting to unlock the door with a wrench, Grey opened the door. Grey's girlfriend saw Grey and A.B., both clothed, standing in the room. A.B.'s boyfriend seemed "startled and angry" and made "very over-the-top accusations," including asking Grey what he gave A.B. and whether he raped her. Grey asked A.B. whether he "hurt [her] in any way" or "force[d] [him]self upon [her]," and A.B. "shook her head and … said no." A.B.'s boyfriend "was not accepting of these answers" and A.B. "looked embarrassed."

¶11 Grey's girlfriend further testified that when A.B. came out of the bathroom, "she was fine. She looked alert, aware, standing upright." And after leaving the house, A.B. "went to go sit in the passenger seat [of her car] by herself." Grey's girlfriend, who had found underwear in the guest bedroom, "took the underwear and gave it to [A.B.'s boyfriend]." He "overreacted again," saying, "oh, my God. Yep. He raped her. He sure did. He did it." At this point, Grey was "on the passenger side [of the vehicle] talking to [A.B.]," and Grey's girlfriend could hear Grey repeat the questions he had asked in the house, including "Did I hurt you? Did I force myself upon you? At any time did you feel unsafe?"

5

¶12     On cross-examination, Grey's girlfriend stated that on the evening in question, she was "more concerned with the strange car in [her] driveway" than with the woman she heard in her house. She testified that she was not angry when Grey came out of the room with A.B., and that Grey never told her why he had been in a locked bedroom with A.B. because she "did not ask." The prosecutor asked the girlfriend why she did not return a December 2019 phone call from a police detective investigating the allegations against Grey, and she stated that she was not ready to talk to law enforcement at that time. She also testified that she did not respond when the prosecutor's office attempted to contact her the week before trial. The prosecutor asked, "So, today, 978 days after this assault, this is the first time we're hearing about any of this from you," and she responded, "From me to you? Correct."

¶13     In closing, the defense argued that Grey and A.B. simply "got caught cheating" and that no sexual assault occurred. The jury found Grey guilty of the charged assault.

## II.  Postconviction Motion and Hearing

¶14     Grey filed a motion for postconviction relief based on four claims of ineffective assistance of counsel. He argued that trial counsel performed deficiently by: (1) failing to present additional testimony from Grey's girlfriend that would have bolstered the argument that the sexual encounter was voluntary and consensual; (2) failing to present testimony from Grey's mother about A.B.'s prior romantic interest in Grey; (3) failing to present evidence refuting A.B.'s claim that Grey lied about his role in a Facebook group; and (4) failing to disclose to the State a statement that Grey's girlfriend provided to a defense investigator in December 2019. Grey asserted that "[t]hese errors, whether viewed collectively or

individually, create a reasonable probability of a different result had the jury heard that evidence."

¶15     The circuit court held an evidentiary hearing on the motion, and trial counsel testified at the hearing.  Counsel testified that the theory of the defense was that Grey "had consensual sex with [A.B.] and that they were caught by their … partners," which led A.B. to "lie[] about whether it was consensual." Postconviction counsel questioned trial counsel about each of the four claims of deficient performance asserted here.

¶16     Grey's first claim was based on trial counsel's failure to present additional testimony from Grey's girlfriend on two subjects: the sounds she heard coming from the locked bedroom and A.B.'s response to the questions Grey posed to A.B. at the car.

¶17     With respect to the sounds coming from the bedroom, trial counsel testified that she knew that Grey's girlfriend told the defense investigator that she heard a woman "moaning," "smacking noises" that sounded like kissing, and noises that "sounded like a porn," but counsel did not consider asking the girlfriend follow-up questions to elicit these more graphic descriptions of the noises.  Counsel considered it "a big advantage" to have limited testimony about what had occurred in the bedroom, and counsel "did not want to highlight" any evidence that there had been "vigorous sexual activity … right before the door was opened," given the evidence that A.B. was extremely impaired at that point.  In addition, counsel questioned whether additional testimony from Grey's girlfriend would help the defense—in counsel's opinion, the girlfriend "came across as extremely … biased, or unable to deal with" the situation she faced and seemed to try "to place all of the blame upon [A.B.] and [A.B.'s] behavior."

¶18    Trial counsel was also questioned about her failure to elicit testimony from Grey's girlfriend regarding A.B.'s answers to Grey's questions when A.B. was sitting in the passenger seat of the car.  Although the girlfriend testified that Grey asked A.B. whether he hurt her or forced himself upon her, counsel did not follow up by asking the girlfriend whether A.B. responded to those questions.  Counsel testified that she did "not recall making a choice" about this and that she "overlooked it."

¶19    Grey's second claim of ineffective assistance was based on trial counsel's failure to call Grey's mother as a witness.  According to the December 2019 report prepared by the defense investigator, A.B. once told Grey's mother that Grey was responsible, kind, and "hot."  Trial counsel agreed that credible evidence suggesting A.B. had a prior romantic interest in Grey would have helped support the defense theory.  However, after meeting with Grey's mother, counsel determined that the mother "came across very much like she would say anything to support [Grey]" and counsel was concerned that "damage could be done if the jury thought [the defense was] calling someone to lie for [Grey]."  Counsel could not remember whether she considered cross-examining A.B. about statements made to Grey's mother "at the time," although she "had considered [it] in planning cross-examination of [A.B.]"

¶20    With respect to Grey's third claim of ineffective assistance, trial counsel acknowledged that the State's trial theory included that Grey had "lured [A.B. to his home] under false pretenses to discuss [a] dog park" and that A.B. "insisted that she only went [to the home] to discuss the opening of the dog park" and not to have a sexual encounter with Grey.  Counsel acknowledged A.B.'s testimony that Grey had lied to her about being "the Facebook administrator for the dog park group," and that counsel had evidence that Grey was, in fact, an

administrator of the group. However, counsel testified that she chose not to present this evidence because she did not "believe that [Grey's status as an administrator] was a linchpin" of the case and because counsel was concerned that "the narrative" could easily have been changed to say that Grey had used his power as an administrator "to get [A.B.] to come over and see him." Postconviction counsel then presented a pretrial court filing by A.B. that described Grey as "an admin for the Facebook group." Trial counsel testified that she "must have overlooked" that statement, and she did not recall considering whether she should use it to impeach A.B. at trial.

¶21  Grey's fourth claim was that Grey's girlfriend's "credibility … was significantly damaged" by trial counsel's failure to disclose a copy of the defense investigator's report to the State as required by WIS. STAT. § 971.23(2m)(am). The report memorialized the pretrial statements that the girlfriend gave to the defense investigator in her December 2019 interview. However, because the report was not provided in discovery, the prosecutor was able to suggest that Grey's girlfriend had not given any account of the events in question until trial, and to further suggest that her testimony was manufactured to help Grey. Trial counsel testified that she "completely overlooked" her obligation to provide the report to the State.

¶22  The circuit court denied Grey's postconviction motion. At the outset, the court stated that in the court's assessment, trial counsel "actually did a great job" and made "generally strategic decisions that made sense at the time."

¶23  The circuit court noted trial counsel's testimony about why she deliberately chose not to delve further into what Grey's girlfriend heard coming from the locked bedroom and the court considered that decision to be a sound trial strategy. Specifically, the court agreed that Grey's conduct "[c]ould have been

9

viewed as a lot more egregious" if additional details had been elicited about what happened in the bedroom and "the jury believed [that A.B. was so impaired that she was] incapable of giving consent." The court also agreed that the girlfriend "would have come across as a less credible witness" who was incapable of seeing Grey as having done anything wrong. Based on those concerns, the court found that counsel's questioning of the girlfriend with regard to the sounds she purportedly heard coming from the bedroom was not deficient performance. The court also determined that trial counsel "did get in testimony" that Grey asked A.B. "whether [he] hurt her." Thus, the court concluded, trial counsel was not deficient with respect to the girlfriend's testimony.

¶24 The circuit court also found that the decisions not to call Grey's mother as a witness and not to dig into the dog park administrator issue were both strategic and reasonable. The court agreed with trial counsel that testimony from Grey's mother "would have come across as self-serving" and would have "hurt the defense." The court further determined that attempting to cross-examine A.B. with the statements from Grey's mother "could have likewise turned off the jury," so it was "in the range of competence" "not to go there." As for the "Facebook administrator thing," the court stated, that "was a minor point" that "cut both ways" for the defense.

¶25 Finally, the circuit court concluded that even if the failure to provide the State with Grey's girlfriend's pretrial report was deficient performance, the error did not result in prejudice to Grey. To the contrary, the court stated that this "actually … put the State at more of a disadvantage, because there was a lot of good stuff [that would have bolstered the prosecution] in that [report] that the State never had access to or never saw."

¶26    Grey appeals, renewing these four ineffective assistance claims.

## DISCUSSION

¶27    Pursuant to the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant asserting ineffective assistance of counsel must establish that counsel's performance was both deficient, falling outside the notably wide range of objectively reasonable attorney representation, and prejudicial, with a reasonable probability of having adversely affected the outcome of the proceeding. *See State v. Mull*, 2023 WI 26, ¶¶35, 37, 406 Wis. 2d 491, 987 N.W.2d 707.  We need not address both the deficient performance and prejudice components of the test if the defendant makes an insufficient showing on one of the components. *Strickland*, 466 U.S. at 697.

¶28    Whether trial counsel's actions constitute ineffective assistance is a mixed question of fact and law. *State v. O'Brien*, 223 Wis. 2d 303, 324, 588 N.W.2d 8 (1999).  We uphold the circuit court's findings of fact, including those regarding "the circumstances of the case and the counsel's conduct and strategy," unless they are clearly erroneous. *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted).  Whether counsel's conduct amounted to ineffective assistance, however, is a question of law that we review independently. *Id.*

### I.  Grey's Girlfriend's Testimony

¶29    We first address Grey's claim that trial counsel was deficient in failing to elicit additional testimony from Grey's girlfriend.  According to Grey, one of the "two key areas" that trial counsel missed was additional detail about the noises the girlfriend heard coming from the locked bedroom.  In her statement to the defense

investigator, Grey's girlfriend described female moaning and kissing noises coming from the room—information that Grey argues would have supported the defense that A.B. was a conscious and voluntary participant in a consensual sexual encounter and only claimed otherwise after being caught cheating. Instead of eliciting that detailed testimony, trial counsel did not ask further questions after the girlfriend testified that she heard a woman who sounded like "she was enjoying herself."

¶30 As trial counsel testified—and the circuit court found as a matter of fact—counsel's decision not to ask further questions was a "strategic decision." Counsel's strategy was based on her concern that Grey's girlfriend would come across as less credible the more she testified about details that occurred in the bedroom, since her version tended to place blame on A.B. and failed to attribute any responsibility to Grey. Indeed, in her statement to the defense investigator, the girlfriend indicated that she "couldn't hear [Grey]," and that she "thought maybe the female was pleasuring herself." Counsel's strategy was also based on her reasonable concern that, given the evidence of A.B.'s impairment, it would be unhelpful for the jury to hear about "vigorous sexual activity" in the bedroom. Again, the court credited trial counsel's testimony and found the concern to be reasonable. "If trial counsel testifies … that the choice under attack was based on a trial strategy, which the circuit court finds reasonable, it is 'virtually unassailable' and the ineffective assistance claim fails." *State v. Sholar*, 2018 WI 53, ¶54, 381 Wis. 2d 560, 912 N.W.2d 89. We agree that the decision not to question Grey's girlfriend further on this topic was a reasonable strategic decision and not deficient performance.

¶31 The other "key area" that Grey asserts his girlfriend should have been asked about is her observation of A.B.'s responses to Grey's questions (whether he

had hurt her or forced himself upon her) when Grey was standing at the passenger side of the vehicle. The girlfriend told the defense investigator that A.B. "continued to shake her head in a negative manner" in response to these questions, but trial counsel did not ask the girlfriend how A.B. responded to the questions. Counsel did "not recall making a choice" about discontinuing the questioning on this topic, and the circuit court did not make a finding as to whether it was an objectively reasonable strategy. However, the court did state its belief that, "as the girlfriend who wasn't able to accept the reality of her situation," additional testimony from the girlfriend on this subject would not have "made a difference" at trial.

¶32 Although nonstrategic omissions are not entitled to the deference we give to strategic decisions of counsel, *see Adeyanju v. Richardson*, 448 F.Supp.3d 984, 995 (W.D. Wis. 2020), our task is to determine whether an omission was objectively reasonable, *State v. Kimbrough*, 2001 WI App 138, ¶¶31-35, 246 Wis. 2d 648, 630 N.W.2d 752. We must do so while being "sensitive to" a circuit court's "assessments of credibility and demeanor." *See Thiel*, 264 Wis. 2d 571, ¶23. Here, the circuit court found that trial counsel held a reasonable belief as to the limited value of Grey's girlfriend's testimony due to her apparent bias. This finding was based on the court's assessment of trial counsel's testimony and the circumstances of the case, *see id.*, ¶21, and it supports a conclusion that it would have been an objectively reasonable strategy to decline to question the girlfriend further. This is especially true given, as the trial court observed, that Grey's girlfriend had already testified about the response A.B. had given inside her house to the same questions. Thus, even if trial counsel overlooked the fact that she did not elicit testimony regarding A.B.'s responses to Grey's questioning at the car, we conclude that choosing not to elicit this testimony would have been objectively reasonable and not deficient performance. *See Kimbrough*, 246 Wis. 2d 648,

13

¶¶31-35 (even when counsel's subjective testimony was that counsel inadvertently failed to present an issue, the failure did not constitute deficient performance because it would have been an "imminently reasonable" decision under the circumstances). Grey has not shown that counsel was ineffective based on the failure to ask additional questions of his girlfriend at trial.

## II. Evidence from Grey's Mother

¶33 Grey argues that trial counsel performed deficiently by failing to present testimony from Grey's mother showing A.B.'s prior romantic interest in Grey or by failing to cross-examine A.B. about her statements to Grey's mother. Evidence of A.B.'s prior interest, Grey argues, would have bolstered the defense theory that A.B. was "caught cheating" with Grey and would have undercut her testimony that she did not "go over to the house to have sex with [Grey]."

¶34 The circuit court credited trial counsel's testimony that the decision "to stay away from calling the mother" was based on the concern that it would have come across as self-serving and incredible and would have "turned off the jury." The court found that choice "in the range of competence," meaning that it was reasonable. We agree that this decision was objectively reasonable and strategic, and precisely the type of decision to which we must be "highly deferential." *See Mull*, 406 Wis. 2d 491, ¶35. We therefore conclude that trial counsel did not perform deficiently in declining to present evidence from Grey's mother at trial. We likewise conclude that counsel did not perform deficiently in declining to cross-examine A.B. about her purported statements to Grey's mother.

### III. Evidence Regarding the Facebook Dog Park Group

¶35 Grey argues that trial counsel was ineffective when she failed to impeach A.B. with records showing that Grey was, in fact, an administrator of the Facebook dog park group. As noted, A.B. testified that Grey lied about being an administrator of the group in the course of explaining how she started talking with Grey and made plans with him to discuss the dog park at his house. During the postconviction hearing, trial counsel testified that she was aware of an email from Facebook showing that Grey was actually an administrator of the group, but counsel chose not to present it at trial, in part out of concern that the narrative would then be that Grey lured A.B. to his home "using this power."

¶36 We reach the same conclusion the circuit court reached on this issue: Grey's status as an administrator was "a minor point" that "cut both ways"; if the jury believed Grey lured A.B. to his house under the pretense of having a discussion about the dog park, it would make him no less culpable, and maybe even more culpable, that he actually was an administrator of the dog park Facebook page.[3] Likewise, A.B.'s pretrial petition describing Grey as "an admin for the Facebook group," which trial counsel overlooked, could reasonably have been deemed unhelpful to the defense. We conclude that it was an objectively reasonable strategy not to further address the issue of whether Grey was an administrator of the Facebook group at trial.

---

[3] Grey asserts that the circuit court did not opine on whether this failure was deficient, but rather that its statement about the issue being "a minor point" reflected a decision based on lack of prejudice. We disagree. The court stated that establishing Grey as an actual administrator "cut both ways" and acknowledged trial counsel's testimony that she believed it would have been just as harmful to the defense, if not more harmful, for Grey to have been portrayed as having used his power as an administrator to lure A.B. to his house. In other words, the court found there was a reasonable rationale for trial counsel's decision not to present the evidence that Grey was an administrator.

## IV. Failure to Disclose Grey's Girlfriend's Prior Statement to the State

¶37    Grey argues that trial counsel's failure to provide the State with the report containing Grey's girlfriend's prior statements to the defense investigator was deficient performance because it allowed the State to argue that the girlfriend "waited more than two and a half years later to come forward" and provide her account, when in fact she had spoken with the investigator within months of the alleged assault.  Trial counsel took responsibility for this error and acknowledged that the report should have been turned over pursuant to statute.  Counsel further acknowledged that she "didn't really go through an analysis" and just "completely overlooked" providing the report to the State.

¶38    The State concedes that this constitutes deficient performance but argues that Grey fails to satisfy the prejudice component of the **Strickland** test for ineffective assistance of counsel.  We agree that the prejudice prong was not satisfied because there is no reasonable probability that the jury would have acquitted Grey had the report been turned over to the State.  *See **Mull**, 406 Wis. 2d 491, ¶37.  As the circuit court pointed out, the statements in the report included information that had the potential to be damaging to the defense.[4]  Further, the existence of the statements would do nothing to contradict the fact that the girlfriend did not respond to law enforcement or the prosecutor's office, as established by her trial testimony.  That she gave her account to an investigator hired by the defense

---

[4] This potentially damaging information included Grey's girlfriend's statement that when Grey was in the locked bedroom, he told her that he was trying to sleep, he said he did not know whose car was in the driveway, and he refused to open the door.  The girlfriend also told the investigator that "[Grey] has never told her what happened in the bedroom and she doesn't want to know," and that she believes "that [Grey] does not want any type of sexual relationship with the women that flirt with him" even though Grey had "asked [her] for permission to flirt back with these girls."  Rather than bolstering Grey's girlfriend's credibility, the State could have used these statements to further undermine her credibility and as inculpatory evidence of Grey's guilt.

several months after the incident would not reasonably affect the outcome of the trial; its only arguable benefit to the defense would have been to prevent the State from arguing in closing that the first time Grey's girlfriend gave her account was at trial, which, as the trial court pointed out, is "not evidence. It's argument."

¶39 As discussed above, Grey has not established that his trial counsel rendered ineffective assistance based on any of his four claims. We therefore affirm the judgment of conviction and the order denying Grey's motion for postconviction relief.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.